IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

SHARON LAFFERTY,              )
                              )
              Plaintiff,      )
                              )
     v.                       )  Case No.
                              )  07-3120-CV-S-REL-SSA
MICHAEL J. ASTRUE, Commissioner )
of Social Security,           )
                              )
              Defendant.      )

### ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT AND GRANTING PLAINTIFF'S ALTERNATIVE MOTION FOR REMAND

Plaintiff Sharon Lafferty seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that (1) the ALJ erred in discounting the opinion of Dr. Troy Barton, (2) the ALJ ignored the third-party statements by plaintiff's friends and family, (3) the ALJ improperly evaluated plaintiff's credibility, (4) the ALJ erred in failing to consider that Medicaid has found plaintiff disabled, and (5) the hypothetical relied on by the ALJ did not include all of plaintiff's credible impairments. I find that the ALJ erred in failing either to discredit the opinion of Dr. Bowles that plaintiff suffers from mild mental restrictions or incorporate that opinion in the hypothetical. Therefore, the decision of the Commissioner will be reversed and this case will be remanded for further consideration.

## I.    BACKGROUND

On November 3, 2003, plaintiff protectively filed an
application for supplemental security income alleging that she
would become disabled as of November 12, 2003.  On January 8,
2004, plaintiff applied for a period of disability and disability
insurance benefits alleging that she had been disabled since
November 12, 2003.  Plaintiff's disability stems from
degenerative disc disease, chronic low back pain after lumbar
fusion, fibromyalgia, obesity, and depression.  Plaintiff's
application was denied on March 2, 2004.  On June 10, 2005, a
hearing was held before Denzel Busick, Administrative Law Judge.
On October 26, 2005, the ALJ found that plaintiff was not under a
"disability" as defined in the Act.  On April 13, 2007, after
considering additional evidence, the Appeals Council denied
plaintiff's request for review.  Therefore, the decision of the
ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for
judicial review of a "final decision" of the Commissioner.  The
standard for judicial review by the federal district court is
whether the decision of the Commissioner was supported by
substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales,
402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847,

2

850-51 (8th Cir. 2000); <u>Johnson v. Chater</u>, 108 F.3d 178, 179 (8th Cir. 1997); <u>Andler v. Chater</u>, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  <u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

3

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

4

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Robert Sanders, in addition to documentary evidence admitted at the hearing and before the Appeals Council.

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The earnings record establishes that plaintiff earned the following income from 1982 through 2004:

5

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1982 | $ 1,611.64 | 1994 | $ 4,381.29 |
| 1983 | 0.00 | 1995 | 12,419.05 |
| 1984 | 1,794.07 | 1996 | 17,546.01 |
| 1985 | 1,935.07 | 1997 | 19,617.87 |
| 1986 | 5,773.95 | 1998 | 19,488.72 |
| 1987 | 7,734.08 | 1999 | 16,149.32 |
| 1988 | 7,711.69 | 2000 | 25,222.52 |
| 1989 | 9,249.13 | 2001 | 28,344.91 |
| 1990 | 12,718.97 | 2002 | 32,668.00 |
| 1991 | 10,385.18 | 2003 | 25,663.70 |
| 1992 | 10,504.87 | 2004 | 0.00 |
| 1993 | 2,500.00 | 2005 | 0.00 |

(Tr. at 53).

**Protective Filing Worksheet**

On November 3, 2003 -- ten days before her back surgery, plaintiff protectively filed an application for supplemental security income alleging that she would become disabled as of November 12, 2003.  Plaintiff's protective filing worksheet lists a phone appointment on December 1, 2003.  The remarks are as follows:  "Husband in home makes approx $2000 gross per/month.  Back problems but has been working, will be bed ridden for 6 months due to surgery.  Insisted on filing.  Explained to applicant that disab[ility] was not meant for 'temporary absence' from work.  Explaining 12 month to death and 100% disab[ility]

6

definition to applicant.  She <u>still</u> insisted on filing."
(emphasis in the original) (Tr. at 405).

**B.  *SUMMARY OF RELEVANT MEDICAL RECORDS***

On November 12, 2003, plaintiff underwent an L5-S1 anterior
lumbar interbody fusion with insertion of L5-S1 interbody cages[1]
(Tr. at 174).  She began physical therapy in the hospital, was
discharged in stable condition on November 14, 2008, and was
given a prescription for Lorcet Plus[2] as needed for pain.

On December 30, 2003, plaintiff saw Jeffrey Del Vecchio, a
physician's assistant, for a follow up (Tr. at 194).  "[She] is
doing very well.  She has no complaints.  Her back is feeling
quite good.  She is very happy with her progress. We will plan on
having her continue with her same restrictions for the next six
weeks.  We will see her back in six weeks to assess her progress.
If everything looks good, we will wean her out of her brace and
begin her on a supervised therapy program."

----

[1]Anterior lumbar interbody fusion (ALIF) is a procedure used
to treat problems such as disc degeneration, spine instability,
and deformities in the curve of the spine. In this procedure, the
surgeon works on the spine from the front (anterior) and removes
a spinal disc in the lower (lumbar) spine. The surgeon inserts a
bone graft into the space between the two vertebrae where the
disc was removed (the interbody space). The goal of the procedure
is to stimulate the vertebrae to grow together into one solid
bone (known as fusion). Fusion creates a rigid and immovable
column of bone in the problem section of the spine. This type of
procedure is used to try and reduce back pain and other symptoms.

[2]A combination of acetaminophen (Tylenol) and hydrocodone (a
narcotic pain reliever).

7

On January 28, 2004, Dr. McQueary completed an Attending Physician's Statement from State Farm Mutual automobile Insurance Company (Tr. at 429-430). He was asked whether in his opinion plaintiff was unable to work at her regular occupation due to her impairment, and he checked "yes". He listed the dates of disability as "11-12-03 to est. 6 months". He was asked how long he expected it to take for plaintiff to be able to return to her normal employment, and he checked "3-6 months". When asked what plaintiff is unable to do, he wrote, "any part of bending, stooping, limited standing, sitting, no twisting, lifting".

On February 10, 2004, plaintiff saw Jeff Del Vecchio, a physician's assistant, for a three-month follow up on her back surgery (Tr. at 257-260). She reported that she has pain in her right leg, left leg and back which she rated a 3 at best and a 6 at worst. She noted that her pain was better as a result of her treatment. She was taking Extra Strength Tylenol, Aleve, and Tylenol 3 (with codeine) for her pain. She reported having trouble sleeping. When asked to circle any problems she was having from a list, she circled "sleep" and drew a question mark next to "depression". Plaintiff had x-rays of her lumbar spine which showed postoperative changes at L5-S1, minimal age indeterminate anterior wedge deformities of T11 and T12, and

8

osteopenia[3].  Mr. Del Vecchio wrote, "Overall she is doing very well.  She is still having some occasional achiness in the lower back, as well as some episodes of twinges of pain in the right leg, but overall she is much improved.  The only complaint that she has is some occasional achiness at night and difficulty with sleep.  X-rays taken today, AP and lateral view of lumbar spine, show fusion appears to be taken nicely at the L5-S1 level."  The plan was for plaintiff to participate in physical therapy for the next four weeks and to begin weaning out of her brace.  She was given a prescription for Flexeril, a muscle relaxer.

That same day she had an initial evaluation with a physical therapist (Tr. at 283-284, 289, 296).  "She states that she is unable to sleep on either side or her back and therefore sleeps on her stomach.  She states that her right foot is intermittently cold.  Her symptoms increase when sitting.  The patient states that she is set to be off of work for six months and will return to a sitting job where she performed a lot of typing.  She states that she is using Tylenol and a muscle relaxer."  Plaintiff was scheduled to participate in physical therapy three times per week for up to eight weeks.

_____

[3]Osteopenia refers to bone mineral density (BMD) that is lower than normal peak BMD but not low enough to be classified as osteoporosis.

Case 6:07-cv-03120-REL   Document 17   Filed 05/30/08   Page 9 of 48

On February 23, 2004, Kenneth Bowles, Ph.D., a clinical psychologist, completed a Psychiatric Review Technique (Tr. at 233-246). He found that plaintiff's mental impairment (depression) is not severe; that she suffers from mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. In support he noted that plaintiff alleged no significant decrease in function on her activities of daily living due to depression, she gets along with people, and she is able to do things like maintaining a checkbook, reading, etc.

Also on February 23, 2004, a DDS physician completed a Physical Residual Functional Capacity Assessment finding that plaintiff could occasionally lift 20 pounds and frequently lift ten pounds, stand or walk for about six hours per day, sit for about six hours per day, and had an unlimited ability to push or pull within the lifting restrictions (Tr. at 383-389). In support of these findings, the doctor wrote, "Claimant has a long history of back pain with conservative treatment to include physical therapy, prescriptions, and TENS. 11/03 had fusion secondary to degenerative disc disease, 12/03 follow up notes she is doing well, happy with progress. X-rays show good position and early bone graft healing. Plan to start weaning out of back

10

brace and starting physical therapy in future."  The doctor found that plaintiff should never climb ladders, ropes, or scaffolds, but could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs.  Plaintiff had no manipulative limitations such as reaching and handling, and she had no visual or communicative limitations.  She should avoid concentrated exposure to vibration and heights.  The doctor then added the following, "Claimant alleges pain and decreased function secondary to degenerative disc disease of back with recent fusion.  These allegations are fully credible at this time.  However, residual functional capacity reflects expected recovery."  In other words, the doctor expected that plaintiff would recover, and the RFC in this assessment is based on plaintiff's expected recovery.

On March 5, 2004, plaintiff's physical therapist prepared a progress report (Tr. at 281, 291).  Plaintiff had undergone six physical therapy treatments including five aquatic therapy treatments.  Plaintiff reported that "whenever she does activity she has pain in the center lower thoracic region and in her lumbar spine. . . .  She states that sometimes it is so bad she feels like she will pass out if she does not sit down.  She states that it happens with sitting and driving."  Plaintiff was not engaging in significant activity.  She reported "one day

going outside, petting her dogs, walking approximately 100 feet in her back yard, then trying to prune some small bushes, and states that she was unable to do that for more than a few minutes before her back became so bad she had to go in and lie down." Plaintiff was taking Advil and Aleve for pain. Plaintiff was switched to aquatic therapy only in order to increase her activity. She was to continue performing stabilization exercises at home.

On March 9, 2004, plaintiff had a follow up visit with Jeff Del Vecchio, a physician's assistant, and Frederick McQueary, M.D., plaintiff's back surgeon (Tr. at 269-271, 285). Plaintiff reported pain in her legs and back rated a 4 at best and a 6 at worst. She reported that her pain had worsened. She was taking Advil, Aleve, Tylenol, and a muscle relaxer. Her x-rays were normal. Plaintiff reported that her one month of physical therapy had made her back worse. She reported that the Flexeril had not helped improve her sleep. She was told to discontinue physical therapy and just ride a stationary bike and participate in a walking program to see if her pain improves. She was given a prescription for Elavil (an antidepressant) to help her sleep.

On March 15, 2004, plaintiff's physical therapy notes state that she increased her speed on the treadmill from 0.6 miles per hour to 1.0 mile per hour (Tr. at 264). She was told to continue

12

in the weight room, on the treadmill, and on the stationary bike.

On March 25, 2004, plaintiff's physical therapist noted that plaintiff had added two minutes on the treadmill but plaintiff thought the stationary bike was hurting her (Tr. at 263). Plaintiff was changed from the stationary bike to NuStep and was told to continue as tolerated.

On December 21, 2004, plaintiff saw Ronald Pak, M.D. (Tr. at 404). Dr. Pak's report reads in part as follows:

> The patient is feeling overall better as far as her pain and depression. She wants to talk to me today about dizziness. She says she has been having chronic problems with vertigo. She insists that it is not lightheadedness. She says it caused her to fall on one occasion. When I asked her how long this had been going on, she says that this has been going on from the first day she saw me, but really, she was referred to me because of her low back and I do not really have any mention of dizziness and being a persistent problem. She had some neck pain and headaches, and because of that, we did an MR of the C-spine which was really unremarkable. Some mild degenerative changes only. She is not having any definite sinus or middle ear problems. She says she gets dizzy when she is more active.
>
> Her only medicines are Neurontin 300 mg q.i.d. [four times per day] and Effexor 150 mg a day. She says she was having this dizziness before the Neurontin and she does not feel that it is the Neurontin. She has been on the Effexor for about a year. . . .
>
> IMPRESSION: Reports of vertigo. This may be a medicine effect. She is going to follow-up with Dr. Barton regarding whether or not she should try to go down on the Effexor. Again, she does not feel it is the Neurontin, but it still may be worthwhile to go down on that to see if that makes a difference in her vertigo. Coping is better. At this point, we will be available as needed. She should continue to exercise and be as active as she is able.

Case 6:07-cv-03120-REL   Document 17   Filed 05/30/08   Page 13 of 48

(Tr. at 404).

On January 10, 2005, plaintiff saw Norman Simon, D.O., a rheumatologist, at the request of Dr. Barton (Tr. at 393-394). Dr. Simon's report reads in part as follows:

> HISTORY OF PRESENT ILLNESS: . . . [S]he generally was in a good state of health until she apparently experienced a lumbar spine injury approximately 1 1/2 years ago. . . . [T]wo lumbar disc removals [were] performed by Dr. Frederick McQueary. Her left lower extremity radicular pain symptoms definitely improved following surgery, though she did not have complete relief of all her lumbar spine pain. She ultimately was referred to the Pain Clinic, though there was a suspicion that she might be developing more of a generalized pain syndrome, such as fibromyalgia. I believe she has seen Dr. Pak in the past who did confirm a diagnosis of fibromyalgia. . . . She indicates that she does have some "good days" but mostly has "bad days." She generally sleeps quite poorly and this has been problematic since her lumbar spine injury. She has recently restarted Ambien 10 mg at bedtime. She has been concerned regarding some recent left lower extremity intermittent give away weakness without notice. She has already fallen once due to her left leg weakness. . . . She has developed some degree of depression since her lumbar spine injury. She has been taking Effexor 150 mg XR daily which does seem to be helpful for her mood. Additionally, she has been on Neurontin 300 mg four times daily, though she is attempting to wean off this medication as she thinks it might be making her depression worse. . . .
>
> CURRENT MEDICATIONS: Effexor XR 150 mg daily, Neurontin 300 mg q.i.d. [four times per day].
>
> * * * * *
>
> SOCIAL HISTORY: . . . She enjoys being a troop leader for the Girl Scouts. . . .
>
> PHYSICAL EXAMINATION:
> . . . Pleasant . . . female who does not appear to have evidence of depressed mood or anxious affect. . . . She definitely has greater than 11 of 18 positive fibromyalgia tender points present. . . .

14

DIAGNOSTIC IMPRESSION:
1.    The patient has been encouraged to attempt to wean
      herself off Neurontin.
2.    Initiate Flexeril [muscle relaxer] 10-20 mg taken at
      bedtime.
3.    She will be referred for left lower extremity EMG and
      nerve conduction velocity studies to determine baseline
      neurologic function of the leg which is apparently
      causing intermittent give away weakness.

(Tr. at 393-394).

On August 25, 2005, plaintiff saw Cary Marquis, M.D., at

Southwest Spine & Sports (Tr. at 418-421).   Dr. Marquis's report

reads in part as follows:

HISTORY OF PRESENT ILLNESS:  Mrs. Lafferty is a 40-year-old
female who relates an injury that occurred at work in
February 2002. . . .  Dr. Mihalevich . . . referred her to
St. John's Physical Therapy, where the patient states she
did have some improvement. The patient returned to work at
Heartland Fragrance and resumed her job of mainly desk work
that was secretarial in nature. . . .  Shortly after this
time there was increased work that was needing to be done at
Heartland Fragrance.  The patient was moved to a portion of
the business where she worked doing production and shipping
work.  The patient states that this involved much more
physical labor and she was working approximately 10-12 hour
days.  This was around the summer of 2002. The patient
returned to her primary care physician because her back pain
had significantly increased with this change in her
workload.  The patient's primary care physician referred her
to a back specialist.  It was at this time that her pain had
increased and the patient states she told her boss that her
back pain was worse.  The patient states that she contacted
an individual associated with workman's compensation who
told the patient she could see any physician.  The patient
states that this is why she returned to her primary care
physician, Dr. Mihalevich, who as previously stated,
referred her to a back specialist.  The patient was
subsequently told that she had to see a workman's
compensation physician.  The patient states she contacted
many of the workman's comp physicians on the list and the
only [one] who would see the patient was Dr. Carper.  This

was around the fall of 2002. The patient states that she saw
the workman's comp physician and he felt that the patient
did not have anything significantly wrong with her at the
time.  The patient then went to urgent care and was being
worked up when it came up that she was actually being
treated for an injury that was workman's compensation.  The
patient stated she returned to Dr. Carper's office where she
feels she did not receive any significant further treatment.
The patient's pain continued and she returned to her primary
care physician where she was re-referred to Dr. Fred
McQueary, a neurosurgeon. . . .  The patient at that time
underwent another course of physical therapy.  She had
treatment with a back brace and treatment with medications.
The patient returned to her front office work at again
involved mainly secretarial type duties.  Unfortunately, the
patient's pain continued and ultimately she was treated by
Dr. McQueary in November of 2003 with lower lumbar surgery.
. . .  From this surgery the patient states she did get some
significant relief of her radicular symptoms, but continued
to have what she described as a tender, burning sensation in
her back. . . .  After this, the patient did complete an
extensive course of physical therapy . . . supervised by Dr.
McQueary.  A note in June of 2004 by Dr. McQueary states
that the patient is going to be referred to a physiatrist
for continued rehabilitation and addressing the patient's
suspected development of fibromyalgia.  It is also suspected
at that time that [she] may have some problem with her
fusion and a CT scan was ordered by Dr. McQueary.  The CT
scan did not show any abnormalities with her fusion with the
anterior interbody fusion cages present at L5-S1 without
subluxation or dislodgement.  In July of 2004, the patient
was evaluated by Dr. Pak of the St. John's Spine Center.  He
felt that the patient did have symptoms that were consistent
with fibromyalgia.  The patient was seen [by] Dr. Barton in
March of 2004 to establish care with a new primary care
physician.  His evaluation showed that the patient did score
positive on the Depression Scale.  He apparently referred
the patient to Dr. Simon some time before February 2005,
where a note by Dr. Simon indicates that the patient has a
diagnosis consistent with fibromyalgia and he recommended
seeing the patient on an as-needed basis.  This is the only
note in the patient's chart from Dr. Simon.  It also appears
that the patient's most recent chart note is from July 23,

16

2004[4], that is from her initial evaluation with Dr. Pak.

Mrs. Lafferty's current complaints [consist] of a burning, irritating pain in her low back.  The patient states that with certain movements she can get significantly increased pain in her low back that is on both the right and left sides.  The patient's pain is constant and she finds that it affects her every day activities, such as her simple activities of daily living that include dressing, bathing, and hygiene tasks, along with secondary activities of daily living that include driving, shopping, and errand running. . . .

DETAILS OF THE FINDINGS:
The patient has an MRI from May 2003, which shows moderate degenerative disc disease along with disc bulge to the right that is positioned next to the right S1 nerve root. This film is essentially unchanged from the patient's previous MRI that was obtained in April of 2002.

The patient's labwork included an ANA, thyroid stimulated hormone, rheumatoid factor, C-reactive protein and chemistries are essentially within normal limits and negative.

A CT scan ordered in June of 2004 by Dr. McQueary showed that the patient's fusion was intact from L5-S1 with no subluxation or dislodgement noted.  The patient has also had an EMG/nerve conduction study that did not show any evidence of radiculopathy, lumbar plexopathy, peripheral neuropathy or nerve entrapment in the patient's lower extremity.

PHYSICAL EXAMINATION:
Ms. Lafferty is a well-appearing female who is able to ambulate on her own into Clinic in no apparent distress. . . .  The patient has normal gait and station.  Examination of the patient's lumbar spine reveals diffuse tenderness to palpation throughout her lumbar musculature, both on the left and right.  There is muscle spasm detected in this area.  The patient's range of motion is mildly limited in all planes secondary to pain. . . .  The patient's range of motion at her hip, knee, and ankle is within normal limits with flexion and extension movements.  The patient also has

---

[4]The record does not contain any medical records dated July 23, 2004.

Case 6:07-cv-03120-REL   Document 17   Filed 05/30/08   Page 17 of 48

normal range of motion with abduction and adduction
movements of her hips. The patient's muscle tone is normal
throughout her bilateral lower extremities. The patient's
strength is graded at 5 out of 5 at her hip, knee, and
ankle. . . . [There are] a total of 13 tender points. . . .

RECORDS REVIEWED:
The patient's medical records are a substantial stack of
documents that are not numbered, but appear to be easily 200
pages. These include, but may not be limited to notes from
Heartland Physical Therapy, notes from St. John's Physical
Therapy, notes from Dr. Carper from occupational medicine
physician, Dr. Mihalevich, primary care physician, Dr. Fred
McQueary, neurosurgeon, Dr. Barton, primary care physician;
Dr. Pak, physiatrist; Dr. Kent, physiatrist; D. Simon,
rheumatologist. . . .

I do not believe at this time further physical therapy nor
surgical interventions would improve the patient's medical
situation at this time.

Current diagnosis for Ms. Sharon Lafferty include:
1.   L5-S1 degenerative disc disease.  Status post L5-S1
     anterior lumbar interbody fusion with cortical bone.
2.   Chronic lumbar muscle spasm.
3.   Chronic lumbar pain.
4.   Fibromyalgia.
5.   Mood Disorder.

                    *  *  *  *  *

IMPAIRMENT RATING:
The patient's permanent partial impairment of the whole
person is 25%.

(Tr. at 418-421).

On November 1, 2005, Dr. Marquis prepared an addendum to his

August 25, 2005, report (Tr. at 422).  Dr. Marquis wrote:

With regard to patient's degenerative changes in her lumbar
spine and chronic muscle spasm that occurred as a result of
a fall at work on February 14, 2002, at Heartland Fragrance,
do believe that patient will have continuing medical needs
in the future.  Patient will most likely benefit from future

18

treatments, such as massage or myofascial relief, to treat exacerbations of muscle spasm that most likely will occur in the future. Patient may also benefit from intermittent treatment with medications that include muscle relaxants and analgesics to assist with treatment with exacerbations that will mostly likely occur in the future. Patient will also most likely need evaluation by a physician prior to initiating therapy with either a masseuse or a physical therapist for treatment and also will need evaluation by a physician prior to obtaining the aforementioned medications. It has been my experience that patients with similar conditions to Ms. Lafferty's have required treatments approximately one to two times per year for exacerbation.

**C.** **SUMMARY OF TESTIMONY**

During the June 10, 2005, hearing, plaintiff testified; and Robert Sanders, a vocational expert, testified at the request of the ALJ.

**1. Plaintiff's testimony.**

At the time of the hearing, plaintiff was 40 years of age (Tr. at 440). She was 5' 3" tall and weighed 200 pounds (Tr. at 440). She was married and had an 11-year-old child (Tr. at 440). She lived with her family in a one-story house (Tr. at 441).

Plaintiff has a high school education (Tr. at 441). She can read and write, and her math skills are reasonably good (Tr. at 441). Plaintiff last worked in November 2003 before her November 12 surgery (Tr. at 441). She was a research coordinate, answering phones, helping in production, researching data on the computer (Tr. at 441). She researched ingredients for new products, trends and sales of bath products (Tr. at 442).

19

Plaintiff did this job for three years (Tr. at 443). Before that she worked for Sunbelt Environmental Services typing and answering phones (Tr. at 443). She supervised five employees, but did not have authority to hire or fire (Tr. at 443-444). Her duties were mainly clerical in nature (Tr. at 444). Prior to that plaintiff was a salon manager (Tr. at 444). She worked as a cosmetologist for about a half a day per week and was the manager the rest of the time (Tr. at 444). She supervised people and did have authority to hire and fire (Tr. at 444). Prior to that she was self employed as a cosmetologist (Tr. at 445). Prior to that she worked as a bank teller (Tr. at 445).

Plaintiff is unable to work now because she cannot lift more than eight pounds, stand for more than 30 minutes, walk for more than 30 minutes, sit for more than an hour, and bend at the waist without pain (Tr. at 446). If she needed to pick up a five-pound package off the floor, she would get on her hands and knees to do it (Tr. at 447). Her daughter helps her (Tr. at 447). Plaintiff cannot do frequent lifting at all (Tr. at 458). Plaintiff must take stairs one at a time going up sideways (Tr. at 447). Her arms bother her when she has them stretched out holding onto a steering wheel (Tr. at 448). Plaintiff's fingers bother her (Tr. at 448).

20

On a typical day, plaintiff will mostly lie around on the couch (Tr. at 449). She does not do laundry, do dishes, cook, vacuum, sweep, mop, or clean the bathrooms (Tr. at 449). Plaintiff goes grocery shopping with her daughter, who pushes the cart and loads and unloads the cart (Tr. at 450).

Plaintiff gets dizzy, falls, and has passed out on multiple occasions from her medication (Tr. at 450). Once she got out of bed, started walking toward the living room, and she hit the door and passed out (Tr. at 450). She did not have any other examples of when she has passed out but she said her medication makes her lightheaded and dizzy and she has to be careful not to get up quickly (Tr. at 450).

Plaintiff's doctor told her to use her hot tub at least once a day to help relieve her lower back pain (Tr. at 451). She gets in four to five times per day for 20 minutes at a time (Tr. at 454). It helps some but the relief does not last long (Tr. at 454). Plaintiff uses a recliner with pillows to elevate her feet in order to help relieve her back pain (Tr. at 455). The recliner has massage therapy and she also uses a heating pad (Tr. at 458). She mostly stays on the couch with a couch pillow (Tr. at 455). Plaintiff was scheduled to begin acupuncture (Tr. at 452). Her fibromyalgia causes fatigue, soreness in her hands, soreness in the muscles about her elbow and in her fingers and

21

legs (Tr. at 452).  She tosses and turns at night and does not get a good night's sleep (Tr. at 452-453).  She also suffers from fibral fog, which is a fuzziness in her ability to think and remember short term (Tr. at 453).  Plaintiff only carries a billfold because a purse hurts her shoulders (Tr. at 454).  Plaintiff has irritable bowel syndrome that started up after her back surgery (Tr. at 454, 456).  She has very little warning when she needs a bathroom and has had accidents if she cannot find a restroom fast enough (Tr. at 454).  This has happened three times in the past, once when she was taking her daughter to the dentist (Tr. at 454).

Plaintiff is also being treated for anxiety attacks (Tr. at 456).  She has these about once a month ranging from 20 minutes to an hour (Tr. at 457).  Her doctor has told her to lie down and try to breathe and relax herself (Tr. at 457).

With medication plaintiff's pain is a four to five on a scale of one to ten (Tr. at 457).  Without medication it is a five to seven (Tr. at 457).

**2.    Vocational expert testimony.**

Vocational expert Robert Sanders testified at the request of the Administrative Law Judge.  The first hypothetical involved a person who could work at the light level, i.e., lift 20 pounds occasionally and ten pounds frequently; sit, stand, or walk for

six hours each; no limitation in the ability to operate hand or foot controls; may occasionally climb stairs, balance, crouch, kneel, stoop, or crawl; shall never work on ladders, scaffolds, or ropes; and should avoid concentrated exposure to high vibrations and hazards such as unprotected heights and fast or dangerous machinery (Tr. at 461-462). The vocational expert testified that such a person could do plaintiff's past relevant work as a cashier, receptionist, general office clerk, complaint clerk, some of the office manager duties, some of the bank teller duties, and some of the research coordinator duties (Tr. at 462).

The second hypothetical included all of the symptoms and restrictions testified to by plaintiff during the administrative hearing (Tr. at 462). The vocational expert testified that the need to sit in a recliner with her feet elevated, to lie down on the couch, having anxiety attacks, having no energy, and having short term memory loss would preclude full-time work (Tr. at 462-463).

## D.   *STATEMENTS OF NON-MEDICAL INDIVIDUALS*

Plaintiff's mother, sister, long-time friend, and husband completed third-party statements.

## 1.   **Patsy Jones**

On December 10, 2004, plaintiff's mother, Patsy Jones, completed a statement of other person (Tr. at 106-107). Ms.

Jones stated that "we can now go shopping together"; however, it appears from the context of the letter that she meant to write, "we cannot go shopping together". Ms. Jones stated that plaintiff is limited as to what she can do around the house. Ms. Jones has to do the lifting for plaintiff when the two go on brief shopping trips. With regard to plaintiff's mental condition, Ms. Jones wrote, "The lost wages, the surgery bills, doctor bills, having to hire a lawyer, her pain and stress causes her to get short or snap back with her Dad and I. Sharon has worked since before she graduated high school. She has contributed to the family income for 17 years. She has not been able to work for over a year now and finances at her home have become drastic. This bothers her considerably and makes her self-esteem depressingly low" (Tr. at 106).

Ms. Jones stated that plaintiff spends a lot of time in bed and she sleeps a lot (Tr. at 107). She stated that plaintiff has been to her therapy faithfully, has done some at home, and Ms. Jones believes plaintiff will be "at this point or worse from here on out." (Tr. at 107). She wrote that plaintiff is unable to take down Christmas decorations because reaching bothers her and she has problems lifting (Tr. at 107).

24

### 2. Linda Herion

Plaintiff's sister, Linda Herion, completed a Statement of Other Person on December 8, 2004 (Tr. at 108-109). Ms. Herion stated that plaintiff lives about 20 miles away. Before her accident, plaintiff "hardly saw" her sister because she was busy. Ms. Herion has been to plaintiff's house to clean for her because she is in pain. She sits, lies, and tries to get comfortable. "So many times" when the two were out together, they would have to take frequent breaks or go home because of plaintiff's pain. Despite following her doctors' instructions, plaintiff is not making progress.

### 3. Anita Kahler

On December 8, 2004, Anita Kahler, plaintiff's friend of 17 years, completed a Statement of Other Person (Tr. at 110-111). Since plaintiff's surgery, Ms. Kahler has helped plaintiff with her chores on a weekly basis. In the past, Ms. Kahler spent time with plaintiff deer hunting, shopping, home decorating, swimming, and boating at the lake. Now when the two get together, Ms. Kahler drives plaintiff around to do her chores. Plaintiff is constantly shifting and adjusting the seat trying to get comfortable. Ms. Kahler does the heavy lifting. Plaintiff tires easily and often asks to stop for a bit to walk around or to find a more comfortable spot to sit and rest. Their visits now

25

consist of going out to lunch or just sitting and visiting. Once
the two went to dinner and a movie, but all during the movie
plaintiff was shifting in her chair. When they got to the car,
plaintiff laid the seat back and complained of "really hurting".
Plaintiff was still hurting the next day and said she had
overdone it by going to the movies.

## 4. John Lafferty

On June 10, 2005, plaintiff's husband, John Lafferty,
completed a Statement of Other Person (Tr. at 148-149). Mr.
Lafferty stated that he and his daughter do most of the cleaning,
cooking, and laundry. He stated that plaintiff spends most of
her time lying around, missing her daughter's activities and
other family functions. Her medication makes her dizzy and
lightheaded. She suffers from anxiety. She passes out and has
been taken to the hospital.

## V. FINDINGS OF THE ALJ

Administrative Law Judge Denzel Busick entered his opinion
on October 26, 2005 (Tr. at 16-25).

Step one. The ALJ found that plaintiff has not engaged in
substantial gainful activity since her alleged onset date (Tr. at
18).

Step two. The ALJ found that plaintiff suffers from
degenerative disc disease with chronic low back pain status-post

26

lumbar fusion, fibromyalgia, and obesity, which are severe
impairments (Tr. at 18). The ALJ found that plaintiff's
depression is not a severe impairment because the medical record
does not set forth any findings which would support any
functional limitations (Tr. at 18).

Step three. The ALJ found that plaintiff's impairments do
not meet or equal a listed impairment (Tr. at 19).

Step four. The ALJ found plaintiff's testimony not entirely
credible. He found that plaintiff retained the residual
functional capacity to lift 20 pounds occasionally and ten pounds
frequently; to sit, stand, or walk for six hours in an eight-hour
workday; to occasionally balance, kneel, crouch, crawl, stoop, or
climb stairs; should never climb ladders, ropes, or scaffolds;
has no limitations with manipulation of the hands, communication,
vision, or using hand or foot controls; and should avoid
concentrated exposure to high vibration and hazards such as
unprotected heights or fast and dangerous machinery (Tr. at 19).
With this residual functional capacity, the plaintiff can return
to her past relevant work as a cashier, receptionist, general
office manager/clerk, complaint clerk, bank teller, or research
coordinator (Tr. at 25).

27

## VI. OPINION OF DR. TROY BARTON

Plaintiff argues that the ALJ erred in discounting the opinion of plaintiff's treating physician, Dr. Troy Barton. Dr. Barton's opinion was not in the record at the time of the ALJ's decision; therefore, the ALJ did not consider it. Nevertheless, the Appeals Council considered Dr. Barton's opinion and explained why it did not provide a basis for changing the ALJ's decision:

> Dr. Barton's assessment is not accompanied by clinical or laboratory findings with the assessment or in other reports from him in the record that would support the limitations stated in his assessment.

(Tr. at 7).

A treating physician's opinion is generally entitled to substantial weight. <u>Charles v. Barnhart</u>, 375 F.3d 777, 783 (8th Cir. 2004). The regulations provide that "if we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic

28

techniques.  <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005);

<u>Ellis v. Barnhart</u>, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ

fails to give controlling weight to the opinion of the treating

physician, then the ALJ must consider several factors to

determine how much weight to give to the opinion of the treating

physician:  (1) the length of the treatment relationship, (2)

frequency of examinations, (3) nature and extent of the treatment

relationship, (4) support ability by medical signs and laboratory

findings, (5) consistency of the opinion with the record as a

whole, and (6) specialization of the doctor.  20 C.F.R. §

404.1527(d)(2) - (5).

The two factors which are most important in this case are

supportability by medical signs and laboratory findings and

consistency of the opinion with the record as a whole.  The

opinion at issue is the Medical Source Statement Physical

completed by Dr. Barton on June 28, 2005:  Dr. Barton found that

plaintiff could lift less than five pounds ever, that she could

stand or walk for a total of two hours per eight-hour day, that

she could stand or walk continuously for only five minutes each

hour, that she could sit for a total of two hours per eight-hour

day, that she could sit continuously for only five minutes each

hour, and that she was limited in her ability to push or pull in

that she could not exceed five pounds "every five minutes of

every hour". He found that plaintiff should never climb, balance, or crouch, and that she could occasionally stoop, kneel, or crawl. He found that plaintiff was limited in her ability to reach, handle, finger, feel, and speak. He wrote, "Severe pain in fingers with normal activity such as filing paperwork. Pain in hands with handling, feeling. Limited speaking due to weakness throughout body." When asked whether rest "beyond the normal rest breaks of 15 minutes morning, 15 minutes afternoon, and 30 minutes for lunch" be medically appropriate and/or necessary due to chronic pain and fatigue, Dr. Barton checked, "no". When asked to describe the "clinical and laboratory findings, signs, and symptoms _or allegations_" (emphasis added) from which the limitations were found, he wrote, "Patient has chronic pain syndrome with chronic fatigue syndrome." Finally, he noted that plaintiff would be likely to be absent more than three times per month due to her impairments or treatment.

Below is a chart showing the differences between the RFC as determined by the ALJ and the RFC as determined by Dr. Barton:

|  | ALJ | Dr. Barton |
|---|---|---|
| Lift occasionally | 20 pounds | Less than 5 pounds |
| Lift frequently | 10 pounds | Less than 5 pounds |
| Sit | 6 hours | 2 hours, but only 5 minutes per hour |
| Stand | 6 hours | 2 hours, but only 5 minutes per hour |

30

| Walk | 6 hours | 2 hours, but only 5 minutes per hour |
|---|---|---|
| Balance | Occasionally | Never |
| Kneel | Occasionally | Occasionally |
| Crouch | Occasionally | Never |
| Crawl | Occasionally | Occasionally |
| Stoop | Occasionally | Occasionally |
| Climb stairs | Occasionally | Never |
| Climb ladders, ropes, scaffolds | Never | Never |
| Hand manipulation | No limitation | Limited |
| Communication | No limitation | Limited |
| Using hand or foot controls | No limitation | Not to exceed 5 pounds every 5 minutes of every hour |

Comparing these abilities to plaintiff's past relevant work as a receptionist, the relevant abilities are walking (plaintiff reported she walked for one hour per day), standing (plaintiff reported she stood for one hour per day), sitting (plaintiff reported that she sat for six hours per day), and lifting (plaintiff reported she lifted a maximum of ten pounds) (Tr. at 82). Plaintiff reported no kneeling, crouching, crawling, climbing, or stooping (Tr. at 82). The ALJ found that plaintiff could return to her past relevant work as a receptionist.

| | ALJ | Dr. Barton |
|---|---|---|
| Walking | 6 hours | 2 hours, but only 5 minutes per hour |

31

| Standing | 6 hours | 2 hours, but only 5 minutes per hour |
|----------|---------|--------------------------------------|
| Sitting | 6 hours | 2 hours, but only 5 minutes per hour |
| Lifting | 20 pounds occasionally, 10 pounds frequently | Less than 5 pounds |

A review of Dr. Barton's medical records clearly shows that his residual functional capacity assessment is not supported by his own records.

Plaintiff saw Dr. Barton four times before he completed the RFC assessment. Dr. Barton never restricted plaintiff's walking, standing, sitting, or lifting. Plaintiff never complained of an inability to stand, walk, sit, or lift.

On March 30, 2004, he found that plaintiff was tender throughout all muscle groups; however, she had full range of motion of all joints. Dr. Barton encouraged plaintiff to increase her activity. He prescribed Ambien for sleep, Prevacid for stomach acid, a non-steroidal anti-inflammatory, and an anti-depressant.

On April 13, 2004, plaintiff saw Dr. Barton for a follow up on gastroesophageal reflux disease. Dr. Barton performed no tests and made no findings. He prescribed a muscle relaxer and a narcotic pain reliever for plaintiff's back.

32

A month later, on May 13, 2004, Dr. Barton performed an exam and found no tenderness in plaintiff's extremities or her neck. She had normal range of motion and normal gait. He prescribed moist heat, a non-steroidal anti-inflammatory, and an anti-depressant.

Plaintiff did not return to see Dr. Barton for more than seven months. On December 30, 2004, he found tenderness in plaintiff's extremities, but normal range of motion and normal gait. He prescribed moist heat, stretching exercises, range of motion exercises, and 45 minutes of activity two times per day. He told her to return in six months.

The records make clear that Dr. Barton did not rely on medical signs or laboratory findings. He never restricted plaintiff's activities; instead, he consistently encouraged her to increase her physical activity and exercise.

In addition, Dr. Barton's Medical Source Statement is internally inconsistent. He found that plaintiff could sit for two hours out of eight, but that she could only sit for five minutes per hour. That actually comes up to a total of 40 minutes of sitting in eight hours, which is inconsistent with his finding that she could sit for two hours total during that time. He made the same findings with respect to her ability to stand and walk. Dr. Barton found that plaintiff could sit for five

33

minutes per hour, stand for five minutes per hour, and walk for five minutes per hour. That leaves 45 minutes per hour when she, according to Dr. Barton, could not stand, walk, or sit. However, when asked whether she would need more than the typical 15 minute morning and afternoon breaks and 30 minute lunch break, he said "no". It is unclear exactly what he would anticipate plaintiff doing for that other 45 minutes per hour.

Another point I want to raise is his finding that plaintiff is limited in her ability to speak due to "weakness throughout her body". There is no allegation anywhere in the record (not in Dr. Barton's records or anyone else's) that plaintiff's body weakness caused her to have trouble speaking. There are no tests or findings in Dr. Barton's records, and I cannot even imagine how body weakness would cause one to be limited in the ability to speak.

Finally, the form Dr. Barton was presented with asks him to describe the "clinical and laboratory findings, signs, and symptoms or allegations". It is clear that his opinion was not the result of clinical and laboratory findings, signs, and symptoms; and it does not even appear to be supported by plaintiff's allegations, as none of Dr. Barton's records include allegations by plaintiff that she is unable to sit, stand, walk, lift, or speak.

Based on all of the above, I find that the Appeals Council's discrediting this opinion of Dr. Barton was proper. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

**VII. *MEDICAID'S FINDING OF DISABILITY***

Plaintiff argues that the ALJ erred in ignoring the fact that Medicaid has found plaintiff disabled.

The ALJ should consider another agency's finding of disability, Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998), but the ALJ is not bound by the disability rating of another agency when he or she is evaluating whether the claimant is disabled for purposes of Social Security benefits. Pelkey v. Barnhart, 433 F.3d 575, 579 (8th Cir. 2006), citing 20 C.F.R. § 404.1504; Fisher v. Shalala, 41 F.3d 1261, 1262 (8th Cir. 1994) (per curiam). Where an ALJ does not mention another agency's finding of partial disability, there is no error if the ALJ fully considered the evidence underlying that agency's final conclusion regarding disability. Pelkey v. Barnhart, 433 F.3d at 579. Furthermore, whether an applicant meets Social Security eligibility requirements is "an inquiry that is different from a state's Medicaid eligibility requirements". Ramey v. Reinertson, 968 F.3d 955, 962 (10th Cir. 2001).

35

The only evidence in the record is a copy of plaintiff's Medicaid card. Plaintiff has pointed to no evidence relied upon by Medicaid that was ignored by the ALJ. I find no error in the ALJ's failure to mention the finding of disability by Medicaid.

## VIII. HYPOTHETICAL

Plaintiff argues that the ALJ erred in relying on a hypothetical that did not encompass all of plaintiff's impairments. Specifically, plaintiff argues that the ALJ failed to consider plaintiff's lightheadedness, drowsiness, and dizziness as side effects of prescription medications; occasional headaches; problems with concentration and memory; monthly anxiety attacks; and mild difficulties in maintaining social functioning and concentration, persistence, or pace.

A hypothetical question posed to a vocational expert must include all credible impairments and limitations. Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006). A hypothetical relied on by the ALJ need not include impairments the ALJ has found not credible. Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Stormo v. Barnhart, 377 F.3d 801, 808-09 (8th Cir. 2004).

Lightheadedness. I found no references to lightheadedness in the medical records. In fact, plaintiff specifically "insisted" to her doctor that she was not experiencing

36

lightheadedness (Tr. at 404). Plaintiff testified at the administrative hearing that she suffers from lightheadedness and her husband prepared a third-party statement that plaintiff gets lightheaded. However, there is no complaint made to any doctor that plaintiff's medication causes her to feel lightheaded.

Drowsiness. I found no reference to drowsiness in the medical records. Plaintiff testified at the hearing and her husband included in his statement that plaintiff gets drowsy. Plaintiff complained to Dr. Barton of difficulty sleeping at night and excess sleeping during the day. He determined that plaintiff's sleep problems were related to her depression, and he prescribed an anti-depressant. She thereafter told Dr. Simon that she was sleeping better. Plaintiff did not complain of drowsiness as a medication side effect to any of her doctors.

Dizziness. Plaintiff complained of dizziness to Dr. Pak. She told him it had been a chronic problem for the past year, but he noted that she had never even mentioned dizziness during any other visit. In addition, although Dr. Pak felt her dizziness might be related to either her Neurontin or her Effexor, she never alleged dizziness to any other doctor, including Dr. Simon, the doctor she saw less than three weeks after she had made this complaint to Dr. Pak.

Occasional headaches.  Plaintiff told Dr. Pak that she
occasionally gets headaches.  Dr. Pak prescribed Neurontin for
plaintiff's fibromyalgia, but her headaches apparently were not
troublesome enough to require any discussion in his diagnosis or
treatment.  Plaintiff told Dr. Simon that she gets occasional
headaches; however, he did not diagnose headaches or treat her
for headaches.  Instead, he recommended that she increase her
aerobic conditioning exercising, which is inconsistent with total
disability.  There is no evidence in any of the medical records
that plaintiff's occasional headaches would decrease any
functional ability even slightly.

Problems with concentration and memory.  Plaintiff told Dr.
Barton that she was having problems with concentration and
memory; however, Dr. Barton conducted no tests in this area and
never made any findings that plaintiff's concentration and memory
were impaired.  Dr. Bowles, a consulting psychologist, found that
plaintiff's mental impairment was not severe, but that she had
mild restriction in concentration, persistence, and pace, among
other things.

Monthly anxiety attacks.  Plaintiff alleges that she
suffered from "monthly anxiety attacks which have necessitated
emergency treatment".  The medical evidence establishes that
plaintiff has suffered from one anxiety attack.  She went to the

38

emergency room because she thought she was having a heart attack. It was determined that her anxiety attack was caused by the stress of having lost her job. There is no other evidence of any other anxiety attacks.

Based on all of the above, I find that the hypothetical posed to the ALJ incorporated all of plaintiff's credible impairments except possibly her mental impairment. Although one consulting psychologist found that plaintiff had "mild" limitation in concentration, he also found that plaintiff's mental impairment was not severe.

The Eighth Circuit, in Hilkemeyer v. Barnhart, 380 F.3d 441, 447 (8th Cir. 2004), held that if the record suggests there are no limitations caused by a non-severe impairment, the hypothetical need not include that impairment:

> Hilkemeyer argues that due to her pulmonary dysfunction her RFC should have limited her exposure to fumes, odors, dust, gases, and poor ventilation. Medical evidence in the record indicated only a mild pulmonary dysfunction. The ALJ's decision not to incorporate this mild pulmonary dysfunction in the RFC, as well as in the hypothetical posed to the VE, was not error because the record does not suggest there were any limitations caused by this nonsevere impairment.

(emphasis added). In this case, however, Dr. Bowles found that plaintiff had "mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace". There is no other evidence in the record to contradict these

findings.  Therefore, even though the mental impairment was found to be non-severe, it cannot be said that there were <u>no</u> limitations caused by this nonsevere impairment.  The ALJ should have included the mild mental limitations found by Dr. Bowles or discredited Dr. Bowles's opinion.  The ALJ did not even mention Dr. Bowles's opinion; instead, the ALJ said that "the medical record does not set forth any findings which would support any functional limitations." (Tr. at 18).  That clearly is not the case.

Because the ALJ did not address the mild mental limitations found by Dr. Bowles, either by discrediting that opinion or including that limitation in the hypothetical, remand is appropriate.

## IX.  *CREDIBILITY OF PLAINTIFF*

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.  Specifically, plaintiff argues that the ALJ improperly evaluated plaintiff's daily activities, medication side effects, and work history.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  <u>Rautio v. Bowen</u>, 862 F.2d 176, 178 (8th Cir. 1988);  <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective

complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999);

McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ,

however, must make express credibility determinations and set

forth the inconsistencies which led to his or her conclusions.

Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v.

Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ

explicitly discredits testimony and gives legally sufficient

reasons for doing so, the court will defer to the ALJ's judgment

unless it is not supported by substantial evidence on the record

as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

Subjective complaints may not be evaluated solely on the

basis of objective medical evidence or personal observations by

the ALJ.  In determining credibility, consideration must be given

to all relevant factors, including plaintiff's prior work record

and observations by third parties and treating and examining

physicians relating to such matters as plaintiff's daily

activities; the duration, frequency, and intensity of the

symptoms; precipitating and aggravating factors; dosage,

effectiveness, and side effects of medication; and functional

restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.

1984).  Social Security Ruling 96-7p encompasses the same factors

as those enumerated in the Polaski opinion, and additionally

states that the following factors should be considered:

Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> [N]o exacerbations or reportedly excruciating pain levels have required emergency medical intervention. Additionally, given the claimant's statements of record, the undersigned finds it reasonable to conclude that prescribed medications provide a level of pain control as do other measures including the application of heat, 20-minute hot tub soaks and exercise. The undersigned also finds a correlation between the reduction in the claimant's level of functioning and the claimant's level of deconditioning, as noted by examining physicians. The medical record documents a history of exaggerated pain complaints versus physical findings. The undersigned is persuaded that without objective medical evidence to support significant physical limitations, such limitations are more self-imposed. Additionally, the claimant has admitted improvement in her mood as well as the quality of sleep with Effexor and Flexeril. However, in review of the claimant's ongoing activities of daily living which include reading, watching T.V., some cooking, weekly errands or shopping and light housekeeping as well as involvement with Girl Scouts, the undersigned finds that, with accommodation, the claimant continues to maintain a level of functioning despite assertions of debilitating levels of pain.

(Tr. at 24).

Because this case will be remanded, the ALJ will be instructed to consider the remaining credibility factors not

42

specifically discussed in the original opinion.  It may be that
express consideration of these factors will not change the ALJ's
credibility determination, as an ALJ is not required to make
express findings on every Polaski factor.  Eichelberger v.
Barnhart, 390 F.3d 584, 590 (8th Cir. 2004).  However, since the
case will be remanded on another issue, the ALJ should have an
opportunity to expand upon the credibility analysis to either
change his finding or to reiterate that considering the factors
not originally discussed does not change the outcome.  The ALJ
should also reconcile his finding that plaintiff's soaking in the
tub relieves her pain with her ability to work, as it would seem
that if soaking in the pain is a necessary form of treatment, the
ability to be work may be compromised.

## X.    THIRD PART STATEMENTS

Plaintiff argues that the ALJ erred in ignoring the third-
party statements of plaintiff's witnesses.

On August 9, 2006, the Social Security Administration issued
Social Security Ruling (SSR) 06-3p, 71 Fed.Reg. 45,593 (Aug. 9,
2006).  The ruling clarified how it considers opinions from
sources who are not what the agency terms "acceptable medical sources."
SSA separates information sources into two main groups:
"acceptable medical sources" and "other sources."  It then
divides "other sources" into two groups:  medical sources and

43

non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007).

Acceptable medical sources include licensed physicians (medical

or osteopathic doctors) and licensed or certified psychologists.

20 C.F.R. § § 404.1513(a), 416.913(a) (2007). According to

Social Security regulations, there are three major distinctions

between acceptable medical sources and the others:

1.  Only acceptable medical sources can provide evidence to
    establish the existence of a medically determinable
    impairment. Id.

2.  Only acceptable medical sources can provide medical
    opinions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)
    (2007).

3.  Only acceptable medical sources can be considered
    treating sources. 20 C.F.R. §§ 404.1527(d) and
    416.927(d) (2007).

In the category of "other sources," again, divided into two

subgroups, "medical sources" include nurse practitioners,

physician assistants, licensed clinical social workers,

naturopaths, chiropractors, audiologists, and therapists. "Non-

medical sources" include school teachers and counselors, public

and private social welfare agency personnel, rehabilitation

counselors, spouses, parents and other caregivers, siblings,

other relatives, friends, neighbors, clergy, and employers. 20

C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the

existence of a medically determinable impairment," according to

SSR 06-3p. <u>Sloan v. Astrue</u>, 499 F.3d 883, 888 (8th Cir. 2007).

"Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." <u>Id</u>. quoting SSR 06-3p.

The courts have consistently criticized the Social Security Administration for failing to discuss third-party statements:

> Where proof of a disability depends substantially upon subjective evidence, as in this case, a credibility determination is a critical factor in the Secretary's decision. Thus, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1255 (11th Cir. 1983). <u>See also</u> <u>Andrews v. Schweiker</u>, 680 F.2d 559, 561 (8th Cir. 1982). In this case, the administrative law judge was, of course, free to disbelieve the testimony of Basinger, his wife, and the affidavits of others. <u>Isom v. Schweiker</u>, 711 F.2d 88, 89-90 (8th Cir. 1983); <u>Simonson v. Schweiker</u>, 699 F.2d 426, 429 (8th Cir. 1983). This, however, the administrative law judge did not do. Rather, the administrative law judge denied disability benefits based on the lack of objective medical evidence.
>
> Basinger should not have his claim denied simply because he failed to see a physician near the time that his insured status expired. The testimony indicated that Basinger had rarely sought medical attention throughout his lifetime. Indeed, his wife stated that she did not believe that Basinger had ever been to a doctor until 1968. She explained Basinger's failure to see a doctor between 1973 and 1980 as owing partly to stubbornness, and partly to finances. A Social Security claimant should not be disfavored because he cannot afford or is not accustomed to seeking medical care on a regular basis. The failure to seek medical attention may, however, be considered by the

45

administrative law judge in determining the claimant's
credibility.

The error in this case was the failure of the administrative
law judge to give adequate consideration to the objective
testimony presented by the two physicians and the subjective
testimony and affidavits of Basinger, his wife, and others.
We do not decide the question of whether this evidence was
sufficient to prove that Basinger was disabled within the
insured period.  Before that determination is made, the
administrative law judge must judge the credibility of the
witnesses.  If all of Basinger's evidence is to be given
credence, we believe that Basinger has at least met his
initial burden of showing that he could not return to his
former employment.  We reverse the decision of the district
court and remand this case to the Secretary for further
consideration of Basinger's claim.  On remand, the
administrative law judge should consider all of the relevant
objective and subjective evidence presented by the claimant,
and if any of the evidence is to be discredited, a specific
finding to that effect should be made.

Basinger v. Heckler, 725 F.2d 1166, 1170 (8th Cir. 1984).

However, the fact that the courts have made this criticism

on a regular basis does not mean that in every case the failure

of an ALJ to analyze the credibility of third-party witnesses

remand is automatic.  For example, in Young v. Apfel, 221 F.3d

1065 (8th Cir. 2000), the court held that the ALJ "implicitly"

evaluated the testimony of the claimant and her witnesses by

evaluating the inconsistencies between her statements and the

medical evidence.

[B]ecause the same evidence also supports discounting the
testimony of Young's husband, the ALJ's failure to give
specific reasons for disregarding his testimony is
inconsequential.  See Lorenzen v. Chater, 71 F.3d 316, 319
(8th Cir. 1995) (arguable failure of ALJ specifically to
discredit witness has no bearing on outcome when witness's
testimony is discredited by same evidence that proves

46

> claimant's testimony not credible). Finally, we find that
> the ALJ did not discredit the statements of Young's friends
> merely on the grounds that they were not medical evidence;
> rather, the ALJ observed that the statements were devoid of
> specific information that could contradict the medical
> evidence regarding Young's capabilities during the relevant
> time period.

Id. at 1068-1069.

See also Carlson v. Chater, 74 F.3d 869, 871 (8th Cir.

1996); Bates v. Chater, 54 F.3d 529, 533 (8th Cir. 1995).

Again, however, because this case must be remanded on

another issue, I believe it is appropriate to allow the ALJ to

expressly state a finding with regard to these third-party

statements, either finding that they are credible but do not

change the outcome, or that they are not credible and for what

reason.

## XI. CONCLUSIONS

Based on all of the above, I find that the ALJ erred in not

either discrediting the opinion of Dr. Bowles or incorporating

that opinion in the hypothetical. Therefore, it is

ORDERED that the decision of the Commissioner is reversed

and this case is remanded pursuant to Sentence Four for the

purpose of (1) either discrediting Dr. Bowles's opinion or

incorporating his opinion into the hypothetical; (2) reassessing

plaintiff's credibility with respect to her daily activities, her

medication side effects, her work history, and her need to sit in

47

a tub for pain relief; and (3) assessing the credibility of the individuals who provided third-party statements.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
May 30, 2008